[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 2, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-16064

_____

D. C. Docket No. 00-03414-CV-BBM-1


COVAD COMMUNICATIONS COMPANY,
DIECA COMMUNICATIONS, INC.,
d.b.a. Covad Communications Company,

Plaintiffs-Appellants,

versus

BELLSOUTH CORPORATION,
BELLSOUTH TELECOMMUNICATIONS, INC.,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 2, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH*, District
Judge.

_____

*Honorable Shelby Highsmith, U.S. District Judge for the Southern District of Florida,
sitting by designation.

BARKETT, Circuit Judge:

Covad Communications Company and Dieca Communications, Inc. (collectively "Covad")[1] appeal the district court's dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6), of their action against BellSouth Corporation and BellSouth Telecommunications Corporation (collectively "BellSouth"). Covad is a seller of high-speed Digital Subscriber Line ("DSL") internet service. BellSouth is a regional telephone service and telecommunications provider, which also sells DSL service. Covad and BellSouth have entered into an "interconnection agreement" to allow Covad to provide DSL service to consumers over BellSouth's existing telephone lines. However, Covad alleges that BellSouth has attempted to stifle competition both by failing to live up to its contractual obligations and through broad exclusionary behavior, including the use of price squeezes, misleading advertising, and the misuse of Covad's confidential customer information. Covad's 24-count complaint asserts that BellSouth's actions violated the Sherman Antitrust Act, the Telecommunications Act of 1996, state anti-monopoly statutes and unfair competition laws, and state law of breach of contract. On appeal, Covad argues that the trial court erred in dismissing Covad's complaint. We agree and REVERSE.

_____

[1]Dieca is a wholly-owned subsidiary of Covad.

2

**BACKGROUND**

BellSouth is the incumbent local exchange carrier ("ILEC") that inherited monopoly control over the local telephone network in a nine-state region after the breakup of AT&T in 1983. Covad, formed in 1996, sells high speed DSL service, a technology that allows consumers and businesses to transmit and receive data over existing copper phone lines. Covad's DSL service competes directly with BellSouth's own DSL and other retail data services, such as dial-up internet access, Internet Services Digital Network ("ISDN") and dedicated line services such as "Frame Relay" and "T-1."

As Covad explains it,[2] to bring its services to consumers in BellSouth's region, Covad must have dependable, timely, and affordable access to the local telephone network controlled by BellSouth. Because of the ubiquitous nature of the local telephone network, the facilities controlled by BellSouth cannot practicably be duplicated. Thus, to operate feasibly, Covad must be able to "interconnect" its DSL network with BellSouth's local telephone network, which means, at its most basic, that Covad needs to be able to connect its wires to the BellSouth wires that make up the local telephone network.

---

[2]Because in this appeal we review <u>de novo</u> the district court's grant of a motion to dismiss Covad's complaint, we take the facts as they are alleged in Covad's complaint. <u>See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.</u>, 711 F.2d 989, 994-95 (11th Cir. 1983).

Congress recognized that new companies seeking entry into the market could not compete if they had to duplicate existing telephone networks, and addressed this concern by passing the Telecommunications Act of 1996 (the "1996 Act"), which requires, among other things, that ILECs allow competitors to interconnect with their networks. The centerpieces of the 1996 Telecommunications Act are sections 251[3] and 252,[4] codified at 47 U.S.C. §§ 251 and 252, which together impose a series of affirmative duties on ILECs like BellSouth, for the benefit of competitive local exchange carriers ("CLECs") like Covad. Sections 251 and 252 also establish the standards for the arbitration and approval of interconnection agreements between ILECs and CLECs.

Pursuant to the 1996 Act, Covad entered into a contract in 1998 with

---

[3]Section 251 imposes various duties on all local exchange carriers ("LECs"): to permit the resale of their telecommunication services; to provide number portability; to provide dialing parity to other LECs; to afford other LECs access to poles, ducts, conduits, and rights-of-way; and, most significantly here, to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. § 251(b). Section 251 also imposes additional obligation on ILECs, including the duty to interconnect their networks with that of any requesting telecommunications carriers "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory," and to negotiate in good faith the agreements establishing the rates, terms, and conditions of these interconnections. 47 U.S.C. § 251(c)(1) and (2).

[4]Section 252 provides for the negotiation, arbitration, and approval of interconnection agreements and requires all parties to participate in any arbitration. 47 U.S.C. § 252(b)(1) and (5). All interconnection agreements adopted by negotiation or arbitration must be submitted for approval to the respective state public service commission ("PSC"). 47 U.S.C. § 252(e).

BellSouth (the "Interconnection Agreement") in which BellSouth agreed, among other things: (1) to allow Covad to "collocate" (place Covad's equipment) in BellSouth central offices throughout its region, providing interconnection between the network controlled by BellSouth and Covad's network; (2) to provide interoffice transport facilities (high capacity connections necessary to connect Covad's equipment in various central offices); (3) to provide nondiscriminatory access to operational support systems ("OSS") to allow Covad to place orders for facilities; and (4) to provide loops (the actual copper wires used for DSL transmission).

In this suit, Covad alleges that Bell South aimed to stifle competition and protect and extend its local telephone monopoly, in violation of the Interconnection Agreement and the antitrust laws, by embarking on a series of dilatory, anti-competitive acts designed to prevent or delay Covad's entry into the DSL market, impede its ability to deliver service to consumers, and drive Covad from the marketplace. In particular, Covad alleges that BellSouth regularly misrepresented the availability of space in BellSouth's central offices so as initially to effectively deny collocation altogether. When it did permit collocation, BellSouth allegedly raised Covad's costs unnecessarily and systematically and in bad faith denied and delayed facilities essential to Covad's success, including interoffice transport, OSS,

5

and local loops, resulting in delays and lost customers. Covad also asserts that BellSouth manipulated its dual role as both Covad's wholesale supplier (of local exchange elements) and its retail competitor (for DSL) by engaging in a "price squeeze"—an intentional pattern of pricing wholesale inputs at such a high level that Covad (or indeed BellSouth itself) cannot absorb those costs and still compete profitably in the downstream retail markets. By assigning inordinately high costs to its wholesale offerings, and inordinately low costs to its retail offerings, BellSouth allegedly squeezed out competitors such as Covad, clearing the field for its own retail services.

Furthermore, Covad alleges that BellSouth strategically understaffed its wholesale division, which BellSouth created to serve customer-competitors like Covad. This strategy slowed down order processing and created backlogs that, at times, included over 5,000 Covad orders. By refusing to develop adequate systems for placing wholesale orders, BellSouth thwarted Covad's aggressive first-to-market strategy, caused Covad to lose customers, impeded Covad's ability to deliver high quality service, and protected BellSouth's monopoly.

Finally, Covad alleges that BellSouth acted with clear motive and intent to destroy DSL competition and competitors like Covad. Covad asserts that BellSouth possessed DSL technology, but did not offer it to the public as a means

6

of internet access until forced to do so in competition with Covad; BellSouth preferred to offer more profitable alternatives such as ISDN or T-1 service, at the expense of consumer choice. When Covad threatened to compete for internet access customers with DSL, a cheaper and more convenient service, BellSouth itself began an aggressive campaign to offer DSL. BellSouth confirmed its anticompetitive intent, Covad says, by falsely disparaging Covad's services and using confidential Covad information to solicit its customers. Covad states that BellSouth's scheme has had the intended effect of denying Covad access to the local internet access markets, substantially lessening competition and consumer choice in those markets, creating higher prices, and stifling innovation.

These actions, according to Covad, violate the 1996 Act, the Sherman Act, and various state laws. The district court, relying on the Seventh Circuit's opinion in Goldwasser v. Ameritech Corp., 222 F.3d 390 (7th Cir. 2000), dismissed Covad's Sherman Act claims, holding that allegations that are based on duties established by the 1996 Act cannot form the basis of a violation of the Sherman Act because (1) "'affirmative duties to help one's competitors . . . do not exist under the unadorned antitrust laws,'" D.C. Opinion at 15 n.8 (quoting Goldwasser, 222 F.3d at 400); (2) "the 'elaborate enforcement structure' of the 1996 Act precludes suits under the Sherman Act for ILEC duties because 'antitrust laws

7

would add nothing to the oversight already available under the 1996 law,'" id. at 15 (quoting Goldwasser, 222 F.3d at 400-01); and (3) even if such allegations could be entirely divorced from the 1996 Act context, such claims nonetheless would not constitute "allegations of a freestanding antitrust claim" because "'[t]he elaborate system of negotiated agreements and enforcement established by the 1996 Act'" should not be "'brushed aside by any unsatisfied party with the simple act of filing an antitrust action.'" Id. at 16-17 (quoting Goldwasser, 222 F.3d at 401).[5]

Turning to Covad's claims under Section 222 of the 1996 Act and for breach of contract, the district court found that, because state commissions have the power not only to approve interconnection agreements "but to later interpret and enforce them as well," "sections 206 and 207 do not grant federal courts jurisdiction . . . when claims directly implicate the regulatory scheme of the 1996 Act," except for the power to review "a determination by a [state commission]." Id. at 37-38. Because Covad's claims "relate directly to duties under the 1996 Act or the

---

[5]The district court, however, did not dismiss Covad's antitrust claims in their entirety; it found that allegations that "BellSouth engaged in predatory advertising and promotion" could support an antitrust violation and dismissed these claims only to the extent that they alleged misuse of proprietary information, a subject that is "covered by paragraph 9 of the Interconnection Agreement." D.C. Opinion at 29-31. The court also declined to dismiss Covad's "monopoly leveraging" claim to the extent it was based on conduct "not implicated by the 1996 Act." Id. at 33.

8

interconnection agreement, which are to be first reviewed and enforced by the respective [state commissions]," the court dismissed those claims. Id. at 38. Finally, the court dismissed Covad's tort claims for interference and unfair competition to the extent they involved any allegation other than "improperly soliciting customers not to enter into contracts with Covad or to breach existing contracts, [and] disparaging Covad's products and services." Id. at 40.[6] The trial court rejected the bulk of Covad's tort claims because they "are merely a restated breach of contract claim which the court has already dismissed for the reasons noted above." Id.

We review a district court's dismissal of a complaint de novo. In particular, "[w]hether specific conduct is anti-competitive is a question of law reviewed de novo." SmileCare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996). "'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 953 (11th Cir. 1986) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). This Court "must accept the facts pleaded as

---

[6]The tort claims not dismissed by the district court were subsequently dismissed by stipulation and are not part of this appeal.

9

true and construe them in a light favorable to plaintiffs." Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983). Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases. In Quality Foods, which involved claims under sections 1 and 2 of the Sherman Act, this Court stated that "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." 711 F.2d at 994. "Although authorized by the Federal Rules of Civil Procedure, the liberal rules as to the sufficiency of a complaint make it a rare case in which a motion [to dismiss] should be granted." St. Joseph's Hosp., 795 F.2d at 953 (footnote omitted).

## DISCUSSION

### I.    Sherman Act Claims

We turn first to the question of whether the litany of facts pleaded in Covad's complaint, if taken as true, state a cause of action for the violation of the Sherman Act. Answering this question requires a two-tiered inquiry. First, we must determine whether the 1996 Act's regulation of local telecommunications markets precludes application of the Sherman Act so that a claim based on facts "inextricably linked" to an alleged violation of the 1996 Act can never, as a matter of law, form the basis of an independent Sherman Act claim. If we conclude that

10

the 1996 Act precludes "inextricably linked" antitrust claims, then our inquiry is at an end. However, if such a claim can stand as an independent Sherman Act claim, then we must determine whether the allegations in Covad's complaint adequately allege a violation of the Sherman Act.

## A. Does the 1996 Act Preempt All Sherman Act Claims?

As a general principle, a statute does not automatically limit causes of action under another statute, and conduct that is alleged to violate one statute can also violate another, subjecting the perpetrator to liability for the violation of each. Moreover, the same conduct may support various theories of liability and expose the perpetrator to different types of damages. At the same time, Congress can determine the contours and extent of the remedy for specific conduct it determines to be unlawful and accordingly limit the causes of action for such conduct. While such congressional limitations can be established explicitly, courts have also determined that if two statutes are deemed to be plainly repugnant to each other, then Congress has implicitly limited one or the other. However, we must be mindful that courts should be reluctant to imply a limitation resulting in antitrust immunity. See Cantor v. Detroit Edison Co., 428 U.S. 579, 597 (1976). "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the

11

antitrust and regulatory provisions." United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350-51 (1963) (footnotes omitted).

The initial question before us in this case is whether Congress intended in the 1996 Act to provide immunity from antitrust violation claims for conduct covered in that Act. We begin by examining the plain language of the 1996 Act to determine whether it expresses any intention to preempt Sherman Act antitrust claims for conduct that is inextricably linked to the 1996 Act. Our examination reveals that, rather than pre-emptive language, Congress specifically and directly stated that the two Acts were intended to be used in tandem to accomplish the congressional goals served by both acts—namely, the stimulation of competition.[7] Congress explicitly stated—both through a savings clause directed specifically at antitrust enforcement and through an additional general savings clause—that the 1996 Act does not supplant or change the antitrust laws. The 1996 Act provides:

> SAVINGS CLAUSE . . . nothing in this Act or the amendments made by this Act shall be construed to modify, impair, <u>or supersede the applicability of any of the antitrust laws</u>.

> NO IMPLIED EFFECT . . . This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede

---

[7]The purpose of the 1996 Act is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. 104-458, 1996 WL 46795, at *1 (1996).

> Federal, State or local laws unless expressly so provided in such Act or amendments.

Telecommunications Act of 1996, sec. 601(b)(1), (c)(1), § 152 note, 110 Stat. 56, 143 (1996) (emphasis added). Thus, in enacting the 1996 Act, Congress did not explicitly supersede the salience of the antitrust laws in the telecommunications industry.

It is clear that plain repugnancy cannot be found between the 1996 Act and the antitrust laws in view of the 1996 Act's express language reserving the applicability of the antitrust laws. An act that expressly preserves the antitrust laws' applicability and fully subjects anticompetitive activities to them cannot be read to impliedly repeal those laws. We agree with the Second Circuit that the "savings clause unambiguously establishes that there is no 'plain repugnancy' between the Telecommunications Act and the antitrust statutes [and thus] that the Telecommunications Act does not provide an 'implicit immunity' from the antitrust laws.'" Law Offices of Curtis V. Trinko v. Bell Atl. Corp., ___ F.3d ___, ___ (2d Cir. 2002). We conclude that the plain statutory language is sufficient to end our inquiry on this matter. CBS Inc. v. Primetime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) ("[W]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete.") (brackets in original) (citations omitted).

13

However, should there be any doubt that the plain language of the savings clause resolves the issue, we find support for our conclusion in the legislative history surrounding the 1996 Act, reflecting that the President, the Congress, the Department of Justice, and the FCC have emphasized the critical need for the antitrust laws to work in conjunction with the 1996 Act in order to spur competition in the telecommunications industry. For example, the Senate Report analyzing the bill specifically provided: "[T]he provisions of this bill shall not be construed to grant immunity from any future antitrust action against any entity referred to in the bill." S. Rep. No. 104-23, at 17 (1995) (R2-7-A18). Thus, the savings clause "prevents affected parties from asserting that the bill impliedly preempts other laws." Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No. 104-458, S. Rep. No. 104-230, at 201 (1996) ("Conference Report"). Throughout the legislative record, Congress repeatedly emphasized that ILECs like BellSouth remain subject to antitrust enforcement:

> Antitrust law is synonymous with low prices and consumer protection – and that is exactly what we need in our telecommunications industry . . . . [T]he bill contains an all-important antitrust savings clause which ensures that any and all telecommunications merger and anticompetitive activities are fully subject to the antitrust laws. . . . And by maintaining the role of the antitrust laws, the bill helps to ensure that the Bells cannot use their market power to impede competition and harm consumers.

142 Cong. Rec. H1145-06 (daily ed. February 1, 1996) (statement of Rep.

14

Conyers).

> The second important antitrust issue in this legislation is the unequivocal antitrust savings clause that explicitly maintains the full force of the antitrust laws in this vital industry. Today we take for granted that the antitrust laws apply to the communications sector. . . . Application of the antitrust laws is the most reliable, time-tested means of ensuring that competition, and the innovation that it fosters, can flourish to benefit consumers and the economy.

142 Cong. Rec. S687-01 (daily ed. February 1, 1996) (statement of Sen. Thurmond).

> I firmly believe that we must rely on the bipartisan principles of antitrust law in order to move as quickly as possible toward competition in all segments of the telecommunications industry, and away from regulation. Relying on antitrust principles is vital to ensure that the free market will work to spur competition and reduce government involvement in the industry.

141 Cong. Rec. S18586-01 (daily ed. December 14, 1995) (statement of Sen. Leahy).

Former President Clinton again emphasized the importance of antitrust enforcement when he signed the 1996 Act into law:

> The Act's emphasis on competition is also reflected in its antitrust savings clause. This clause ensures that even for activities allowed under or required by the legislation, or activities resulting from FCC rulemaking or orders, the antitrust laws continue to apply fully.

Statement by President William J. Clinton upon Signing S. 652, 32 Weekly Comp. Pres. Doc. 218 (February 8, 1996), reprinted in 1996 U.S.C.C.A.N. 228-1, 228-3.

Thus, both the legislative and executive branches recognized that the antitrust laws

15

would coexist alongside the Act.

Finally, in implementing sections 251 and 252 of the 1996 Act (governing the arbitration for and approval of interconnection agreements between ILECs like BellSouth and CLECs like Covad), the FCC formally acknowledged that its regulations did not provide the "exclusive remedy" for anticompetitive conduct. First Report and Order, In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499, ¶ 124 (Aug. 8, 1996) (R2-7-A174).  The FCC emphasized that, in addition to judicial review of arbitrations setting the terms of interconnection agreements, "parties have several options for seeking relief if they believe that a carrier has violated the standards under section 251 or 252," id., expressly including private antitrust enforcement: "[W]e clarify . . . that nothing in sections 251 and 252 or our implementing regulations is intended to limit the ability of persons to seek relief under the antitrust laws."  Id. at ¶ 129 (R2-7-A175) (footnote omitted).

Thus, in view of the plain statutory language and the legislative pronouncements of the intended coexistence of the antitrust laws and the 1996 Act, we cannot agree with Goldwasser to the extent that it is read to say that a Sherman Act antitrust claim cannot be brought as a matter of law on the basis of an allegation of anti-competitive conduct that happens to be "intertwined" with

16

obligations established by the 1996 Act.[8]

At the same time, we agree with <u>Goldwasser</u> that merely pleading violations of the 1996 Act alone will not suffice to plead Sherman Act violations. Thus, a claim that a defendant failed to live up to its contractual obligations under an

---

[8]The <u>Goldwasser</u> court stated:

> Nevertheless, when one reads the complaint as a whole these allegations appear to be inextricably linked to the claims under the 1996 Act. Even if they were not, such a conclusion would then force us to confront the question whether the procedures established under the 1996 Act for achieving competitive markets are compatible with the procedures that would be used to accomplish the same result under the antitrust laws. In our view, they are not. The elaborate system of negotiated agreements and enforcement established by the 1996 Act could be brushed aside by any unsatisfied party with the simple act of filing an antitrust action. Court orders in those cases could easily conflict with the obligations the state commissions or the FCC imposes under the § 252 agreements. The 1996 Act is, in short, more specific legislation that must take precedence over the general antitrust laws, where the two are covering precisely the same field.

<u>Goldwasser</u>, 222 F.3d at 401.

The district court interpreted this language to mean that a Sherman Act antitrust claim cannot ever be brought if it alleges conduct also covered by the 1996 Act. We disagree that <u>Goldwasser</u> stands for such a broad proposition, and note that <u>Goldwasser</u> tied its conclusion to the specific allegations of the complaint in that case. We do agree, however, with the Second Circuit in <u>Trinko</u>, when it concluded that "controlling case law does not support the theory that specific legislation meant to encourage competition necessarily takes precedence over the general antitrust laws," <u>Trinko</u>, ____ F.3d at ____ (citing <u>Otter Tail Power Co. v. United States</u>, 410 U.S. 366 (1973)). The Second Circuit also noted that "[i]t is unlikely that allowing antitrust suits would substantially disrupt the regulatory proceedings mandated by the Telecommunications Act." <u>Id</u>. While acknowledging that injunctive relief in such suits may require judicial restraint, the <u>Trinko</u> court stated that "[a]warding damages for the willful maintenance of monopoly power would not substantially interfere with the regulatory scheme envisioned by the Telecommunications Act," noting that in some instances, "it is possible that the antitrust laws will be needed to supplement the regulatory scheme" to bring competition to the local phone service markets. <u>Id</u>. at ____ (footnote omitted).

17

agreement made pursuant to the 1996 Act in and of itself will be insufficient to establish an antitrust violation. However, if a plaintiff also pleads facts that, if true, tend to show an anticompetitive purpose to create or maintain a monopoly, then that plaintiff has pleaded an antitrust violation.[9] Because we believe that the 1996 Act does not preempt claims under the Sherman Act as a matter of law, we turn to the question of whether Covad has pleaded a valid antitrust claim.

**B.    Does Covad's Complaint Sufficiently Allege a Violation of the Sherman Act?**

Establishing a Section 2 monopolization violation requires proof of two elements: "(1) the possession of monopoly power in the relevant market and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or

---

[9] In Goldwasser, the plaintiff pleaded 20 counts, seventeen of which explicitly cited violations of the 1996 Act. Goldwasser then alleged that "[a]ll of these practices . . . violate both § 2 of the Sherman Act, 15 U.S.C. § 2, and the 1996 Act itself." Goldwasser, 222 F.3d at 395. None of the charges involved any allegations of anticompetitive intent; rather, the complaint merely asserted that the defendant was a monopolist, and that it had violated the 1996 Act. The Seventh Circuit observed, consistent with what we have said above, that such allegations of mere failure to fulfill obligations under the 1996 Act are insufficient to state a claim under the Sherman Act: "The fundamental fallacy in the plaintiffs' theory is that the duties the 1996 Act imposes on ILECs are coterminous with the duty of a monopolist to refrain from exclusionary practices. They are not." Id. at 399. The Goldwasser court further observed that there exists no independent duty to help competitors under the antitrust laws. Therefore, "[a] complaint like this one, which takes the form 'X is a monopolist; X didn't help its competitors enter the market so that they could challenge its monopoly; the prices I must pay X are therefore still too high' does not state a claim under Section 2." Id. at 400.

historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); accord Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481-83 (1992). Monopoly power is defined as "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). A firm that does not achieve monopoly power may nonetheless violate Section 2 through "attempted monopolization." Proving attempted monopolization requires a showing of: (1) anticompetitive or exclusionary conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor." United States v. Griffith, 334 U.S. 100, 107 (1948), disapproved of on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). An assessment of intent is critical in determining whether an accused monopolist's actions qualify as anti-competitive conduct. Id. at 106-07; accord United States v. Colgate & Co., 250 U.S. 300, 307 (1919) (stating that "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to

19

parties with whom he will deal").

Covad's Sherman Act claims fall under three different categories of alleged anti-competitive behavior. First, Covad complains that BellSouth denied Covad the use of an "essential facility," namely its network of telephone lines. Although, as Covad recognizes, the antitrust laws in general do not require that firms (including monopolies) affirmatively help their competitors to succeed, there is a narrow exception to this general rule when a monopolist improperly withholds access to an "essential facility" without which a competitor cannot enter or compete in a market. See, e.g., Consolidated Gas Co. of Fla., Inc. v. City Gas Co. of Fla., 880 F.2d 297, 301 (11th Cir. 1989) (hereinafter, "Consolidated Gas I").[10] Second, Covad complains about BellSouth's "refusal to deal." Although a party may ordinarily choose freely the companies with which it will conduct business, when a monopolist's refusal to deal is accompanied by the intent to monopolize and the requisite degree of market power, that refusal to deal may violate Section 2. See, e.g., Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial, Inc. 919 F.2d 1517, 1522 (11th Cir. 1990). Third, Covad alleges that BellSouth illegally manipulated its dual role as both Covad's wholesale supplier (of local exchange

---

[10]Consolidated Gas I was reinstated, en banc, by 912 F.2d 1262 (11th Cir. 1990) ("Consolidated Gas II"), which was then vacated and remanded in 499 U.S. 915 (1991), because the parties reached a settlement and the case therefore became moot."

elements) and its retail competitor (for DSL) by engaging in a "price squeeze." A price squeeze is an intentional pattern of pricing wholesale inputs at such a high level that Covad cannot absorb those costs and still compete profitably in the downstream retail markets. See, e.g., Cities of Anaheim, Riverside, Banning, Colton & Azusa, Cal. v. Fed. Energy Regulatory Comm'n, 941 F.2d 1234, 1238 (D.C. Cir. 1991). Covad alleges that by assigning inordinately high costs to its wholesale offerings, and inordinately low costs to its retail offerings, BellSouth squeezes out competitors such as Covad, clearing the field for its own retail services.

It is important to recognize that each of these three theories is related to Covad's allegation that BellSouth engages in what is known as "monopoly leveraging." Monopoly leveraging occurs when a firm uses its market power in one market to gain market share in another market other than by competitive means. See Aquatherm Indus., Inc. v. Fla. Power & Light Co., 145 F.3d 1258, 1262 (11th Cir. 1998) (citing Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 276 (2d Cir. 1979) ("[T]he use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market.")). For example, in this case, while BellSouth may not at present have a monopoly in the high-speed internet

21

market, it can attempt to leverage its clear monopoly in the telecommunications market by refusing to deal with or provide essential facilities to competitors in the high-speed internet market. We have previously held that monopoly leveraging can violate Section 2: "[W]hen a party with monopoly power abuses its monopoly power in one market as a means of gaining an unlawful competitive advantage in and monopolizing another market, we have no hesitation to conclude that the Sherman Act prohibits such conduct." Key Enters. of Del., Inc. v. Venice Hosp., 919 F.2d 1550, 1568 (11th Cir. 1990), vacated as moot by 9 F.3d 893 (11th Cir. 1993). The Supreme Court has also found that a triable question of fact exists on a Section 2 claim where a defendant used its control over one market to gain dominance in another market. See Eastman Kodak, 504 U.S. at 482-83; see also Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 431 F.2d 334, 339 (5th Cir. 1970).[11] Guided by these basic principles of antitrust law, we consider Covad's three claims sequentially.[12]

_____

[11]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[12]We stress here that our inquiry is limited by the standard of review appropriate to BellSouth's Rule 12(b)(6) motion. Covad need only have alleged necessary elements of the relevant claims. We are not presented here with deciding, for example, whether telephone lines are in fact essential facilities for providing high-speed internet service, or whether BellSouth in fact had monopolistic intent in performing the alleged anticompetitive conduct. The standard of review at this stage is, of course, different than those at summary judgment or at trial.

1.     Essential Facilities

The withholding of access to an essential facility without which a competitor cannot enter or compete in a market is a violation of the antitrust laws. See Consolidated Gas I, 880 F.2d at 301.  Under the well-established "essential facilities" doctrine, an inference of anticompetitive intent in violation of Section 2 arises upon a showing of four elements:  (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.  See MCI Communications Corp. v. AT&T, 708 F.2d 1081, 1132-33 (7th Cir. 1983).  By exercising its control over an essential facility (sometimes called a "bottleneck") to withhold access to that facility, a monopolist can exclude competition.  For example, in Consolidated Gas I, we found that a massive system of natural gas pipes controlled by the defendant was an essential facility.  Control over that bottleneck, the gas pipelines, enabled the defendant to exercise its power in the market to exclude competition.  See Consolidated Gas I, 880 F.2d at 301.  "Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms."  MCI, 708 F.2d at 1132.

In MCI, 708 F.2d at 1133, the Seventh Circuit held that the local telephone

23

network was an essential facility and that AT&T could not deny MCI reasonable access to it. Covad argues that MCI is essentially indistinguishable from the present case, and uses it as a template in stating the elements of its essential facilities claim. First, Covad alleges that BellSouth controls an essential facility, indeed, the same essential facility (local telephone exchange) at issue in MCI. See id. Second, Covad alleges that it would not be economically feasible "to duplicate Bell's local distribution facilities (involving millions of miles of cable and line to individual homes and businesses), and regulatory authorization could not be obtained for such an uneconomical duplication." Id. Third, Covad contends that BellSouth denied interconnections to the essential facilities, and fourth, did so even though the interconnections could have been feasibly provided. See id. Finally, Covad maintains that BellSouth's conduct was intended to, and did, leverage BellSouth's local exchange monopoly into the local internet access markets to exclude Covad and to create or preserve BellSouth's monopoly power in the local internet access markets. See id.

BellSouth's response to this claim begins with a critique of the essential facilities doctrine itself, explaining that "[e]ssential facilities claims—along with other doctrines that Covad invokes in passing—exist at the fringes of antitrust law." Br. of Appellee at 34 (citing Blue Cross & Blue Shield United of Wisc. v.

24

Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995) ("[T]he essential-facilities line[] has been criticized as having nothing to do with the purposes of antitrust law."). Whatever the merits of this critique, as the Seventh Circuit observed in Blue Cross, "[w]e are not authorized to abrogate doctrines that have been endorsed and not yet rejected by the Supreme Court." Blue Cross, 65 F.3d at 1413 (citing Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 376 (7th Cir. 1986)).

With regard to the substance of Covad's essential facilities claim, BellSouth responds with three points. First, BellSouth argues that Covad cannot allege the most basic element of an essential facilities claim: the actual denial of access to an essential facility. BellSouth states that Covad conceded that BellSouth has participated in the interconnection and negotiation/arbitration process, and that BellSouth has provided all of the types of facilities that Covad has sought. According to BellSouth, the dispute is thus restricted to the following matters: the specific terms, timing, and implementation of the interconnection agreement; the alleged "delays" in obtaining collocation space and transport; and the "obstacles" in obtaining loops. BellSouth maintains that these complaints are properly characterized as claims regarding the terms or quality of access under the interconnection agreement, and that none of these claims can amount to an antitrust

25

claim.

Second, BellSouth argues that Covad's claim fails because the essential facilities doctrine never applies where a competitor seeks "preferential access" or asks the owner to "abandon its facilities." Br. of Appellee at 39 (citing MCI, 708 F.2d at 1133). BellSouth explains that when Covad purchases an unbundled loop, it gains exclusive use of that loop, and that antitrust laws have never required a monopolist to "cease using its own facility so that [a competitor] can begin using it." Id. (quoting City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1366 (9th Cir. 1992)).

Third, BellSouth argues that Covad is attempting to use antitrust law not merely to gain access to facilities, but also to force BellSouth to construct new facilities or to alter the nature of its business and become a renter of facilities for competitors to use. BellSouth observes that "[n]o case has suggested that the monopolist must build new capacity to satisfy a would-be sharer." Id. at 40 (quoting 3A Areeda & Hovenkamp, Antitrust Law ¶ 773e, at 214). BellSouth characterizes Covad's claim as an attempt to harness the antitrust law to force BellSouth to build new facilities, to develop new software, or to modify existing facilities quickly enough to meet Covad's alleged business needs.

For the most part, these are arguments that must be addressed at a later stage

of the proceedings, such as summary judgment or trial. We note that with regard to BellSouth's first point, Section 2 prohibits denial of access to essential facilities on reasonable terms. See Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 542 (9th Cir. 1991); City of Vernon, 955 F.2d at 1367; Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d 539, 545 (4th Cir. 1991); accord Del. & Hudson Ry. v. Consol. Rail Corp., 902 F.2d 174, 179-80 (2d Cir. 1990) ("[i]t is sufficient if the terms of the offer to deal are unreasonable"). The "applicable legal standard" is that "[a]ny company which controls an 'essential facility' or a 'strategic bottleneck' in the market violates the antitrust laws if it fails to make access to that facility available to its competitors on fair and reasonable terms that do not disadvantage them." United States v. AT&T, 524 F. Supp. 1336, 1352-53 (D.D.C. 1981) (emphasis added) (citing United States v. Terminal R.R. Ass'n of St. Louis, 224 U.S. 383, 411 (1912), and Otter Tail Power Co. v. United States, 410 U.S. 366 (1973), among other cases). As the Supreme Court explained in Terminal R.R., a monopolist must provide access to essential facilities "upon such just and reasonable terms and regulations as will, in respect of use, character, and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary

companies."[13]  224 U.S. at 411.  Whether or not Covad can ultimately prove a violation, its complaint does allege that Bell South sometimes denied access to its facilities outright and other times denied access on reasonable terms.[14]

As to BellSouth's second argument, we likewise note that the case upon which BellSouth relies, City of Vernon, 955 F.2d at 1361, affirmed a summary judgment, not a Rule 12 dismissal.  Moreover, City of Vernon sought exclusive use of a relative share of defendants' entire electrical transmission facilities.  See id. at 1364 & nn. 3 & 4.  As we understand the claim here, Covad seeks temporary use of an element of the ratepayer-funded local telephone network only for so long as Covad has a customer, after which BellSouth regains full use of the facility (which at all times remains its property).  That temporary use seems quite similar to the use of a pipeline in Consolidated Gas I and is nothing more than MCI found

_____

[13]BellSouth cites to a number of cases denying essential facilities claims, but those cases are distinguishable from the present case.  For example, Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 748 (3d Cir. 1996), affirming summary judgment, involved alleged overcharges under the parties' contract, not denial of access to essential facilities.  Anserphone, Inc. v. Bell Atl. Corp., 955 F. Supp. 418, 428-29 (W.D. Pa. 1996), found plaintiff's evidence of poor service an insufficient "constructive denial" of access to withstand summary judgment.  Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 569 (2d Cir. 1990) and Valet Apt. Servs. Inc. v. Atlanta Journal & Constitution, 865 F. Supp. 828, 830-31 (N.D. Ga. 1994), involved fact-bound disputes about whether and where to place print advertisements.

[14]BellSouth's argument that the essential facilities claim is really an ordinary breach of contract claim does not support its motion to dismiss.  Covad's allegations of anticompetitive conduct can and do "support antitrust liability" at the pleading stage.  Mr. Furniture Warehouse, 919 F.2d at 1522-23 (monopolist's refusal to deal supports Section 2 claim where it is "designed to have an anticompetitive effect").  Breach of contract and antitrust are not mutually exclusive.  See City of Vernon, 955 F.2d at 1368.

28

proper.  See MCI, 708 F.2d at 1132-33.  In any case, these are primarily fact issues that reflect upon the feasibility of the requested relief.  It would thus be inappropriate to grant dismissal on this basis.  Similarly, whether the relief sought would unreasonably require BellSouth to construct new facilities as opposed to granting nondiscriminatory access to existing ones is primarily a question of fact inappropriate for disposition on a motion to dismiss.

Without venturing any opinion on the merits of its specific allegations, we conclude that Covad's complaint satisfies the "exceedingly low" threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim, Quality Foods, 711 F.2d at 995, namely, that it must adequately allege that as an integrated telecommunications company with monopoly control, BellSouth attempted to leverage its monopoly power in the high-speed internet market by giving itself preferential access to its essential facilities.

2.    Refusal to deal

Covad also claims anticompetitive conduct based on BellSouth's refusal to deal with a competitor or potential competitor.  Although a party may ordinarily choose the companies with whom it will conduct business, the existence of a "right to refuse to deal with other firms does not mean that the right is unqualified." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601 (1985).

29

When a monopolist's refusal to deal is accompanied by the intent to monopolize and the requisite degree of market power, that refusal to deal may violate Section 2. See Mr. Furniture, 919 F.2d at 1522 (citing National Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc. 747 F.2d 1396, 1402 (11th Cir. 1984), and Otter Tail, 410 U.S. at 377-78); accord Lorain Journal Co. v. United States, 342 U.S. 143, 154 (1951); Mid-Texas Communications Sys., Inc. v. AT&T Co., 615 F.2d 1372, 1387 (5th Cir. 1980) (right to refuse to deal is "limited when the company possesses a monopoly because the danger exists that it may use its monopoly position to decrease competition in other markets"). As the Supreme Court has explained, "[i]t is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." Eastman Kodak, 504 U.S. at 483 n.32; accord Aspen, 472 U.S. at 600-05 (affirming jury's monopolization finding where monopolist ski resort ended joint marketing program with competitor).

The Seventh Circuit has summarized the Supreme Court's holding in Aspen in terms useful to our consideration of the present case:

> Aspen Skiing Co. v. Aspen Highlands Skiing Corp. . . . goes the furthest of any case we know toward imposing (more precisely, allowing a jury to impose) a duty under antitrust law to help a competitor; and as a recent decision by the Supreme Court it requires our most careful and respectful consideration. The Aspen Skiing Company owned three of the four mountains that make up the Aspen

30

skiing complex. Aspen Highlands Skiing Corporation owned the fourth. The two companies had offered their customers a joint ticket, usable on all four mountains, and the suit arose because Aspen Skiing Company terminated this cooperative arrangement. The Supreme Court found that for the convenience of customers an owner of a ski mountain in a multi-mountain skiing area normally would want to offer a ski ticket usable on any of the mountains. The joint ticket had originated at a time when there was competition among the different ski mountains at Aspen, and similar tickets were offered at other multi-mountain ski areas. 105 S. Ct. at 2858. In other words, competition required some cooperation among competitors. Aspen Highlands is not a conventional monopoly refusal-to-deal case like Otter Tail because Aspen Highlands was never a customer of Aspen Skiing Company; the skiers are the customers. But it is like the essential-facility cases in that the plaintiff could not compete with the defendant without being able to offer its customers access to the defendant's larger facilities.

Olympia, 797 F.2d at 377.

As we understand it, Covad's refusal-to-deal claim is based on alleged facts that are virtually identical to those supporting its essential facilities claim; that is, Covad simply alleges that BellSouth has refused to deal with Covad with respect to an essential facility, and that this refusal was motivated by monopolistic intent.[15]

---

[15]BellSouth argues that Covad's complaint contains no specific allegation that BellSouth has forgone any economic advantage by failing to provide Covad with the accommodations it desires. Although it may be true that there is no specific allegation of this sort, the entire complaint alleges that BellSouth's failure to live up to its contractual duties was motivated by its will to monopolize, and showing that BellSouth has forgone an economic advantage is simply a fact that, if true, would tend to support the contention of monopolistic intent in the fact of a proffered legitimate business justification. Here, on motion to dismiss, there is no proffered legitimate business justification for Covad to refute, so the absence of specific factual allegation is irrelevant. See, e.g., Eastman Kodak, 504 U.S. at 483-84 (ruling on a summary judgment motion and noting that after plaintiff's presentation of evidence of Kodak's exclusionary action with monopolistic intent, Kodak bore the initial burden of presenting evidence of "valid

31

The claim is thus an amalgam of <u>Aspen</u> and <u>Otter Tail</u>, in that Covad is a customer of BellSouth that would like to purchase from BellSouth the right to interconnect with BellSouth's essential facility.

In response, BellSouth argues that <u>Aspen</u> is inapposite, because in that case the Court held that the defendant had a duty to continue to deal where <u>termination</u> of the relationship would involve a "sacrifice [of] short-run benefits and consumer goodwill" in the interest of excluding a rival and reducing competition. 472 U.S. at 610-11. BellSouth argues that Covad has never alleged that BellSouth has refused to deal (much less terminated a relationship); rather, BellSouth says, Covad alleged that Covad and BellSouth established a new relationship. We do not find this argument persuasive. In <u>Aspen</u>, which involved competitors only (not a competitor-customer relationship), defendant's termination of an existing joint-marketing relationship and accompanying sacrifice of short-term benefits supported the jury's inference of the defendant's anticompetitive intent. <u>See</u> <u>Aspen</u>, 472 U.S. at 610-11. However, those are not prerequisites for a refusal-to-deal claim, and <u>Aspen</u> does not say or suggest that they are. Other cases, such as <u>Otter Tail</u>, involve a refusal to deal where there has been no prior arrangement, and a vertically integrated monopolist that refuses to deal with a customer to foreclose

business reasons" to justify its actions).

32

competition in a second market may violate Section 2.  See Olympia, 797 F.2d at 376-77.  In other words, in Aspen, the fact that the defendant had terminated a long-standing and mutually economically beneficial agreement was significant only because it supported the jury's conclusion that the defendant's refusal to deal had been motivated by monopolistic intent rather than legitimate business purpose.

We note that in Stein v. Pac. Bell Tel. Co., 173 F. Supp. 2d 975, 983 (N.D. Cal. 2001), the district court held that plaintiff had stated a valid antitrust claim on refusal-to-deal facts similar to those in the present case.  In Stein, according to the plaintiff, Pacific Bell "entered into these optional and voluntary [1996 Act] agreements and then breached them or proceeded to engage in bad faith conduct in carrying them out, without any business justification and with the intent to destroy its competitors . . . so as to unlawfully maintain its monopoly."  Id.  Citing Aspen, the plaintiff claimed that such conduct violated Section 2 of the Sherman Act because Pacific Bell was "attempting to exclude rivals on some basis other than efficiency," thus making its conduct "predatory."  Id.  The Stein court held that even accepting Goldwasser in its entirety, the plaintiff had stated a valid claim.  Id. at 983-84 ("Goldwasser did not consider whether violations of the 1996 Act, if done in a 'predatory' manner as defined in Aspen Skiing, can make up an independent basis for liability under the Sherman Act.  The plaintiffs in

Goldwasser did not allege, as Stein alleges here, that the defendant breached interconnection agreements in bad faith and engaged in other exclusionary practices.").

In essence, BellSouth asks this Court to conclude that it is impossible to find a refusal to deal where the defendant has formed an agreement with the plaintiff, in this case an agreement pursuant to the strictures of the 1996 Act. For the reasons stated above, we conclude that allegations that allege a failure to perform under an agreement that amount to a refusal to deal are sufficient to state a claim under the antitrust laws.[16]

3.    Price Squeeze

Covad also alleges that BellSouth manipulated its dual role as both Covad's wholesale supplier (of local exchange elements) and its retail competitor (for DSL) by engaging in a "price squeeze." BellSouth argues that Covad's allegations must fail because, as the district court stated, "there is no allegation that [BellSouth] set accompanying low retail prices for its own DSL services." BellSouth argues that in light of the 1996 Act's regulatory scheme, Covad's failure to allege accompanying low retail prices is fatal because BellSouth has no discretion over

---

[16]Again, this case is presented to us on a motion to dismiss. BellSouth's response that it has not in fact refused to deal, while an appropriate issue for consideration on motion for summary judgment or at trial, is not open to consideration here.

the prices it charges Covad for unbundled loops and other "inputs" that Covad uses; those charges are set by state commissions after extensive proceedings in accordance with the Act's standards. BellSouth maintains that these rates are not "mere[ly] tariff[ed]" and BellSouth is not free to lower those rates unilaterally. Compare Br. of Amici Curiae Competitive Telecommunications Ass'n at 29 n.11. In addition, BellSouth argues that section 252 provides that all network element rates must be "based on cost," 47 U.S.C. §252(d)(1); accordingly, Covad's failure to allege that the rates BellSouth charges for its retail DSL service are below cost forecloses Covad's claim. BellSouth argues that antitrust law cannot possibly force a company to raise above-cost retail prices to give competitors a greater margin, because such a rule would hurt, rather than help, consumers. In essence, BellSouth contends that Covad's claim boils down to a complaint that the network element rates set by state commissions are too high. BellSouth further asserts that the appropriate remedy for this complaint is not a collateral antitrust action, but judicial review under Section 252(e)(6).

Covad responds by stating that its complaint in fact did allege that BellSouth's retail prices "are set so low related to its unbundled wholesale loop prices that Covad cannot meet BellSouth's wholesale or retail prices and still make a reasonable return on its investment." More important, Covad maintains, this

issue is irrelevant because whether or not there is a price squeeze should not depend on whether retail prices are "too low," but rather on the "squeeze" created by the disparity between the wholesale prices Covad must pay BellSouth upstream and the prices Covad must charge downstream to remain competitive with BellSouth. See, e.g., City of Kirkwood v. Union Elec. Co., 671 F.2d 1173, 1176 n.4 (8th Cir. 1982). The presence of an illegal differential, Covad states, is precisely what Covad alleged. Covad also states that commission or other regulation at the wholesale end (or even both ends) of the price squeeze is no defense.

Both sides cite a number of cases in support of these positions,[17] but BellSouth's response to the claim is essentially factual in nature, and therefore it is inappropriate to grant BellSouth's motion to dismiss under Rule 12. Whether or not BellSouth has any control over the wholesale prices it charges, or whether the

---

[17]BellSouth cites Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223 (1993) (rejecting "the notion that above-cost prices that are below . . . the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws"); Indeck Energy Servs., Inc. v. Consumers Energy Co., 250 F.3d 972, 978-79 (6th Cir. 2000) (plaintiff "ha[s] no statutory right to compete in the economic marketplace on [its] own terms and in such a manner as to accumulate expected profits"). Compare Br. of Amici Curiae Competitve Telecomm. Ass'n at 29 n.11 (arguing that BellSouth should have raised retail prices to protect competitors).

Covad responds with City of Kirkwood, 671 F.2d at 1179, and Fed. Power Comm'n v. Conway Corp., 426 U.S. 270, 279 (1976) ("When costs are fully allocated, both the retail rate and the proposed wholesale rate may fall within a zone of reasonableness, yet create a price squeeze between themselves.") (citation omitted).

36

differential between the wholesale and retail prices is such that Covad and other would-be DSL competitors are squeezed out—these are questions of fact. BellSouth may very well prevail on summary judgment, but for the purposes of the pleading stage, Covad's complaint states a claim under antitrust law.

## II.   Breach of Contract Claims

The district court dismissed Covad's breach of contract claims for lack of jurisdiction, finding that they must first be presented to PSCs.  This Court, however, recently held that "state commissions . . . are not authorized under section 252 to interpret interconnection agreements" at all.  Bellsouth Telecomm., Inc. v. MCImetro Access Transmission Servs. Inc., 278 F.3d 1223, 1237 (11th Cir. 2002).  BellSouth concedes that the trial court's reasoning is "inconsistent with Bellsouth v. MCImetro." In light of MCImetro, the trial court's dismissal for lack of jurisdiction must be reversed.

## III.   The 1996 Act Claim

The trial court dismissed Covad's 1996 Act claim because it found any claims "relate[d] directly to duties under the 1996 Act" must be submitted to PSCs. R3-25-38.  For the same reasons that apply to Covad's breach of contract claims, this ruling is inconsistent with MCIMetro and must be reversed.

## IV.   State Law Claims

The trial court concluded that Covad's state tort law claims were "preempted by the 1996 Act." This holding is irreconcilable with the Act's express "No Implied Effect" clause, which set forth Congress' intent not to "modify, impair, or supercede Federal, State or local laws." Telecommunications Act of 1996, sec. 601(c)(1), § 152 note, 110 Stat. 56, 143 (1996).

BellSouth does not attempt to defend the trial court's ruling, but argues instead that Covad has failed to plead any tort claims, asserting that conduct that constitutes a breach of contract can never support an interference claim. The cases BellSouth cites, St. Mary's Hosp. of Athens, Inc. v. Radiology Prof'l Corp., 421 S.E.2d 731, 735 (Ga. Ct. App. 1992), and International Telecomm. Exch. Corp. v. MCI Telecomms. Corp., 892 F. Supp. 1520, 1543 n.19 (N.D. Ga. 1995), do not support that broad proposition. Rather, they were summary judgment cases where plaintiffs had failed to produce evidence that the defendant had actually induced any third party not to contract with the plaintiff. At the Rule 12 stage, the only proper inquiry is whether Covad has alleged such direct interference. It has, in claiming that BellSouth "interfered with Covad's existing and prospective business relations with customers." Therefore, the dismissal of Covad's tort claims must also be reversed.

## CONCLUSION

38

For the reasons stated above, the decision of the district court granting

BellSouth's motion to dismiss is **REVERSED**, and the case is **REMANDED** for

further proceedings in light of this opinion.