VERIZON NEW JERSEY, INC.
and Verizon Pennsylvania,
Inc., Plaintiffs,

v.

NTEGRITY TELECONTENT
SERVICES, INC.,
Defendant,

v.

Verizon Maryland, Inc., Third
Party Defendant.

Civ. No. 99–5366(GEB).

United States District Court,
D. New Jersey.

Aug. 12, 2002.

Karol Corbin Walker, St. John and Wayne, L.L.C., Newark, NJ, John Thorne, Ajit Pai, Verizon, Arlington, VA, Dan K. Webb, Charles B. Molster, III, Winston & Strawn, Aaron M. Panner, Kellog, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, for Plaintiffs and Counterclaim Defendants and Third Party Defendants.

Steven G. Sanders, Arseneault & Fassett, Chatham, NJ, Diana D. Parker, Law Offices of Diana D. Parker, Edward Rubin, Law Offices of Edward Rubin, New York City, Attorneys for Defendant and Counterclaim Plaintiff and Third Party Plaintiff.

**OPINION**

GARRETT E. BROWN, Jr., District Judge.

This matter comes before the Court upon the motion of Verizon for dismissal of

Ntegrity's antitrust Counterclaim and Third Party Complaint, and upon Ntegrity's cross-motion to dismiss plaintiffs' collection action. The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and having considered the submissions and the arguments of the parties, grants in part and denies in part Verizon's motion, and denies Ntegrity's motion.

## I. BACKGROUND

### A. Legislative and Factual Background

As it serves as the basis for the instant litigation and motion practice, the Court must first review the history and purpose of the Telecommunications Act of 1996 ("1996 Act" or "the Act"), which amended the Communications Act of 1934, 47 U.S.C. § 151 et. seq. At one point in history, local telephone service was a sanctioned monopoly. *See Trinko v. Bell Atlantic Corp.*, 294 F.3d 307 (2d Cir.2002). However, in 1996, Congress enacted the Telecommunications Act in an effort to create competition in the once monopolized market. *See id.* at 312. Under the Act, states are no longer permitted to enforce laws prohibiting entry into the local telephone market. *See id.* In order to generate competition in the local telephone service market, the Act imposes affirmative duties upon existing incumbent local exchange carriers ("ILECs") such as Verizon. *See id.* These duties include providing "access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers." *Id.* (quoting 47 U.S.C. § 251(b)(4)). Additionally, the Act requires that ILECs provide interconnection with their networks to the competing local exchange carriers ("CLECs") "that is at least equal in its quality to that provide by the local

exchange carrier to itself." *Id.* (quoting 47 U.S.C. § 251(c)(2)(C)).

The 1996 Act therefore imposed a duty upon Verizon, an ILEC, to provide services to CLECs such as Ntegrity. *See* Amended Answer Counterclaims and Third Party Complaint of Ntegrity ("Am.Answer") ¶¶ 16–17. Ntegrity was founded as a minority owned CLEC in 1998, with the goal of providing local telephone services to the general public. *See id.* ¶ 17. Pursuant to the 1996 Act, Ntegrity entered into contracts with Bell Atlantic New Jersey, Bell Atlantic Pennsylvania and Bell Atlantic Maryland.[1] *See id.* Each of the interconnection agreements were filed with and approved by the respective state commissions. *See* Verizon's Brief in Support of Dismissal ("Verizon Br.") at 5. The negotiated contracts each provided for a one year term, after which either party could terminate the agreement by providing written notice 90 days in advance of the desired termination date. *See id.*

Ntegrity describes the local exchange services they sought to provide as the "originating or terminal point for interstate telephone and data transmission services." Am. Answer ¶ 17. Ntegrity acquired its first customer in July 1998, and added more than 1,000 customers by September of that year and nearly 8,000 customers in both November and December of 1998. *See id.* ¶ 18. The contracts created by Ntegrity and the Verizon entities serve as the basis for the instant disputes.

### B. Procedural History

The parties in the instant matter have been engaged in this litigation for nearly three years. In November 1999, Verizon,

---

**1.** Bell Atlantic is now known as Verizon. For the purposes of this Opinion, the Court will refer to the collective plaintiffs and the Third Party defendant as Verizon. When necessary, the Court will refer to the individual parties as Verizon Pennsylvania, Verizon New Jersey and Verizon Maryland.

formerly known as Bell Atlantic, filed two separate Complaints against the defendant, Ntegrity Telecontent Services. *See* Ntegrity's Brief in Opposition ("Ntegrity's Br.") at 6. Verizon Pennsylvania, claimed that defendant failed to pay overdue bills in violation of the resale agreement between the parties. *See id.* Similarly, Verizon New Jersey filed a complaint alleging that Ntegrity failed to pay its bills according to their contract. *See id.* In response, Ntegrity filed a Counterclaim alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 2(a) of the Clayton Act, 15 U.S.C. § 13(a), as well as New Jersey and Pennsylvania state law antitrust statutes. *See* Am. Answer ¶¶ 84–181. Additionally, Ntegrity included a Third Party Complaint against Verizon Maryland alleging similar violations. *See id.* Ntegrity also included a number of state law breach of contract and tortious interference claims against all three Verizon parties. *See id.*

The parties consented to the consolidation of the Verizon Pennsylvania and Verizon New Jersey claims and this Court entered an Order to that effect on April 11, 2000. Shortly thereafter, Verizon filed a motion to dismiss Ntegrity's Counterclaim and Third Party Complaint in its entirety. The Court considered whether Ntegrity had properly asserted the necessary elements of an antitrust claim.

### 1. Decision of the Court in the Previous Motion to Dismiss

In the prior Memorandum and Order of the Honorable Anne E. Thompson, U.S.D.J., the Court concluded that Ntegrity had sufficiently pled the elements of a section 2 Sherman Act claim for abuse of monopoly power.[2] *See* October 31, 2000 Memorandum and Order ("10/31/00 Or-

der") at 3. Specifically, the Court found that Ntegrity alleged that Verizon "willfully acquired and maintained monopoly power" through various anti-competitive techniques. *Id.* at 3–4.

The Court also sustained Ntegrity's claims for Sherman Act liability for attempted monopolization. *See id.* at 5. The Court found that Ntegrity relied upon the same allegations as set forth in their alternate Sherman Act claim, and thus sustained Ntegrity's allegations. *See id.* Similarly, the Court allowed Ntegrity's claim of price discrimination under section 2 of the Clayton Act. *See id.* To do so, the Court inferred that Ntegrity defined telephone service as a commodity. *See id.*

However, Ntegrity's allegations of illegal tie-ins under Section 1 of the Sherman Act were dismissed. *See id.* at 6. The Court determined that Ntegrity had failed to state a claim because it did not allege that it was denied telephone service because it refused to buy other services from Verizon. *See id.* Ntegrity's claim under Section 206 of the Telecommunications Act was also dismissed. *See id.* at 7. The Court found that Section 206 did not create a separate cause of action, and dismissed that portion of the Counterclaim. *See id.*

Moving on to Ntegrity's state law claims, the Court determined that it had adequately pled claims for breach of contract and malicious interference with business relations. *See id.* at 7–8. Similarly, the Court sustained Ntegrity's claims for breach of good faith and fair dealing. *See id.* at 8–9. In conclusion, the Court allowed Ntegrity the opportunity to amend its Counterclaim and Third Party Complaint. *See id.* at 9. Ntegrity subsequently filed its amended pleading.

---

**2.** This matter was originally assigned to the Honorable Anne E. Thompson, U.S.D.J. and subsequent to her decision on Verizon's origi-

nal motion, this matter was transferred to the undersigned.

### 2. Ntegrity's Amended Answer, Counterclaim and Third Party Complaint

Ntegrity alleges that at the time of its Counterclaim, Verizon controlled approximately 97% of the local telephone service in New Jersey, Pennsylvania and Maryland. *See* Am. Answer ¶ 19. Ntegrity states that Verizon engaged in a number of anti-competitive tactics in an effort to maintain its monopoly market share. *See id.* Those alleged practices included illegal tie-ins; unjust discriminatory switching fees; discriminatory denial of access to pricing information; intentionally error-prone and discriminatory computer interface systems; error prone billing; and preventing Ntegrity customers from placing long-distance phone calls. *See id.*

Specifically, Ntegrity alleges that Verizon intentionally utilized a discriminatory and error prone billing method for CLECs like Ntegrity. *See id.* ¶ 21. Ntegrity claims the billing errors created the need for it to extensively audit the bills submitted by Verizon, and this process utilized more than 100 hours per week. *See id.* ¶¶ 21, 25. Additionally, Ntegrity asserts that the error rate on the bills generated by Verizon for the CLECs was substantially higher than the error rate for Verizon's own large retail customers. *See id.* ¶ 21. Ntegrity maintains that the billing errors made it impossible to conduct an actual accounting of the money it owes to Verizon. *See id.* ¶ 24. Ntegrity contends that electronic billing would have alleviated some of the problems with the billing errors, but Verizon would only offer that service at "a prohibitive cost." *Id.*

Ntegrity also claims that the bills it received from Verizon were inaccurate because the tariffs assessed against Ntegrity were set by regulation based on the value of Verizon's equipment. *See id.* ¶ 28. Ntegrity points to an audit conducted in 1999 by the FCC, which determined that the value of Verizon's equipment was overstated in New Jersey, Pennsylvania and Maryland. *See id.* ¶ 29. Ntegrity maintains that this resulted in excess charges of more than $65,000,000.00 to Verizon customers. *See id.* Based on those figures, Ntegrity assumes that it has been overcharged by approximately $300,000.00. *See id.* ¶ 31.

Further, Ntegrity alleges that Verizon charged new Ntegrity customers a switching penalty when they transferred their service from Verizon. *See id.* ¶ 34. Ntegrity alleges that this was called a Record Order Charge, but that it was actually "without justification and unreasonable." *Id.* Ntegrity contends that the Record Order Charge is not specifically enumerated in the contract between the parties, and is only indirectly incorporated into those agreements. *See id.* ¶ 35. Ntegrity maintains that there is not a viable reason for the imposition of this charge, even though it is normally charged when a new customer establishes service with Verizon. *See id.* ¶ 36. Ntegrity states "Third Party Defendants said they would charge only a $3.00–$6.00 switching fee," and alleges that if Verizon had only charged a $4.00 switching fee, then it has been over billed for approximately $125,000.00. *Id.* ¶ 38. Ntegrity also maintains that Verizon occasionally waives this Record Order fees for its retail customers, and thus alleges that these charges are discriminatory. *See id.* ¶ 40.

Ntegrity also contends that Verizon has repeatedly cut off long distance service prior to switching customers from Verizon to Ntegrity. *See id.* ¶ 43. Ntegrity alleges that when it switched its own long distance provider, its customers were unable to place long distance phone calls because Verizon failed to make that change in a timely manner. *See id.* ¶ 45. Ntegrity provided its customers with dial

around numbers to correct the problem and alleges that Verizon blocked those codes. *See id.* ¶ 47. Ntegrity also complains of poor and late data it received about its customers from Verizon. *See id.* ¶ 49.

Ntegrity alleges that Verizon refused to supply it with meaningful billing information that could be used to bill Ntegrity customers. *See id.* ¶ 51. Ntegrity contends that Verizon refused to supply such information between April 1998 until August 1999, and that it was required to comb through Verizon's tariff books before it could decode the bills it received. *See id.* Ntegrity claims an 84% error rate on its bills and a consequent customer loss. *See id.* ¶ 53.

Ntegrity also alleges that Verizon requires manual processing by resellers whenever a CLEC wins a new customer. *See id.* ¶ 54. Defendant maintains that this processing must occur before it can switch a customer from Verizon to Ntegrity, and that it drives up the costs to the reseller. *See id.* Ntegrity contends that it should not have to provide such detailed information before a customer can be switched because Verizon already has all the relevant information about its current customers. *See id.* ¶ 56. Ntegrity challenges that this process is cumbersome and creates numerous opportunities for human error. *See id.* ¶ 57. Slow provisioning or switching is another issue addressed by defendant. *See id.* ¶ 62. Ntegrity complains that it can take up to 30 days for Verizon to switch a customer over to Ntegrity and it only takes three days for them to add a new retail customer. *See id.*

Another complaint is that Verizon created illegal tie-ins between its Bell Atlantic Yellow Pages company and the provision of local telephone service. *See id.* ¶ 63. Ntegrity claims that Verizon would offer month-to-month payment plans to its retail

customers, and would require up-front payment for Yellow Pages ads for any customers that switched to a CLEC such as Ntegrity. *See id.* ¶ 63. Ntegrity also contends that Verizon withheld voice mail services from Ntegrity customers, and that such services have since been required by legislation in New York, Delaware and Vermont. *See id.* ¶ 64. Ntegrity alleges that it can only purchase voice mail service in New Jersey, Pennsylvania and Maryland if it signs a volume and term agreement. *See id.* ¶ 65.

Ntegrity contends that its customers have been confronted with continuous attempts to win back their business. *See id.* ¶ 66. Ntegrity maintains that Verizon has attempted to win back its customers before it even switched those customers over to Ntegrity's service. *See id.* Related is Ntegrity's claim that Verizon made repeated material misrepresentations about Ntegrity to its existing and potential customers. *See id.* ¶ 67.

Ntegrity also sets forth complaints about the text and content of the contracts that the parties negotiated pursuant to the Act. *See id.* ¶¶ 69–79. Defendant claims that enforcement of the contracts "would permit the continuation of Third Party Defendants' anti-competitive conduct and violations of the Telecommunications Act under the protective umbrella of the contracts." *Id.* ¶ 70. Ntegrity complains that the contracts require it to use the allegedly discriminatory computer interface system described in the Amended Answer. *See id.* ¶ 71. Ntegrity also dislikes the requirement that it provide an irrevocable letter of credit guaranteeing payment of any disputed billing amounts. *See id.* ¶ 72. Ntegrity states that the contracts obligate Verizon to provide daily customer usage records which were not immediately provided. *See id.* ¶ 73. Ntegrity also maintains that the contracts allow Verizon

to unilaterally determine what ancillary services, such as voice mail, could be provided "without unreasonable expense." *Id.* ¶ 74. Ntegrity contends that Paragraph 32 of the contract "purports to limit the services that Subsidiary Third Party Defendants will provide." *Id.* The contracts also specify that untimely and inaccurate bills are not considered breaches of the interconnection agreements. *See id.* ¶ 78.

Based on these allegations, Ntegrity asserts claims for abuse of monopoly power under Section 2 of the Sherman Act as well as under the New Jersey and Maryland antitrust statutes. *See id.* ¶¶ 84–102. Ntegrity also asserts claims alleging attempted monopolization under Section 2 of the Sherman Act as well as the Maryland and New Jersey antitrust statutes. *See id.* ¶¶ 102–121. In addition, Ntegrity alleges a price discrimination claim under Section 2(a) of the Clayton Act, commonly known as the Robinson–Patman Act, and a claim under Section 251(b) and (c) of the Telecommunications Act.[3] *See id.* ¶¶ 122–130. Finally, Ntegrity asserts claims under the state laws of New Jersey, Maryland and Pennsylvania for breach of contract; tortious interference with business relationships and breach of the implied duty of good faith and fair dealing. *See id.* ¶¶ 130–181.

### 3. Ntegrity's Application for a Preliminary Injunction

Subsequent to the decision on plaintiff's first motion to dismiss, Verizon notified Ntegrity that it intended to discontinue service to Ntegrity's customers after January 31, 2000 because of its failure to pay overdue bills. *See* Verizon Br. at 6. On January 31, 2000, Verizon stopped providing service to any new Ntegrity customers and informed the state commissions of its decision to stop offering new service. *See id.* Verizon, however, continued to provide service for Ntegrity's already existing customers. *See id.* On May 11, 2001, Ntegrity filed a motion for a preliminary injunction to prevent Verizon from terminating service to those existing customers. *See id.* at 8.

This Court rejected Ntegrity's application, as did the New Jersey Board of Public Utilities. *See id.* at 8–9. The Board required a letter of credit from Ntegrity in the amount of $500,000.00, which Ntegrity declined to prepare. *See id.* at 9. The Board authorized termination of service upon proper notice to Ntegrity's existing customers. *See id.* After the required notice was provided, the Board authorized termination of service. *See id.* at 10. On July 25, 2001, Verizon stopped providing service to all remaining Ntegrity's customers. *See id.*

### 4. Instant Motions to Dismiss

Verizon filed the instant motion to dismiss subsequent to Ntegrity's submission of its Amended Answer Counterclaim and Third Party Complaint. Verizon asks this Court to re-visit the sufficiency of Ntegrity's antitrust claims based on newly decided precedent that was not considered in the prior Memorandum and Order. *See id.* at 11. Ntegrity opposes the motion and seeks to dismiss Verizon's collection claims based on a lack of prudential standing pursuant to Fed.R.Civ.P. 17(a).

## II. DISCUSSION

### A. Standard for Motion to Dismiss

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) may be granted only if,

---

**3.** As highlighted by Verizon, Section 252(c)(4) of the Telecommunications Act does not exist. *See* Verizon Br. at 11 n. 5. Ntegrity confirms that it intended to cite § 251(b) and (c). *See* Ntegrity Br. at 38 n. 5.

accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *See Oran v. Stafford,* 226 F.3d 275, 279 (3d Cir.2000) (citation omitted); *Langford v. City of Atlantic City,* 235 F.3d 845, 850 (3d Cir.2000) (citation omitted). The Court may not dismiss a complaint unless the plaintiff can prove no set of facts that would entitle him or her to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe v. Government of the Virgin Islands,* 938 F.2d 427, 428 (citing *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1394–95 (3d Cir. 1991)); *see also Langford,* 235 F.3d at 850; *Dykes v. Southeastern Pennsylvania Transp. Auth.,* 68 F.3d 1564, 1565 n. 1 (3d Cir.1995). A complaint may be dismissed for failure to state a claim where it appears beyond any doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom v.*

*Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss").

A district court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

### B. Verizon's Motion to Dismiss

#### 1. Ntegrity's Antitrust Claims

Verizon urges this Court to re-examine the claims pled by Ntegrity in light of *Goldwasser v. Ameritech Corp.,* 222 F.3d 390 (7th Cir.2000). Verizon argues that this Court should dismiss Ntegrity's Counterclaim because the Telecommunications Act imposes affirmative duties on ILECs which reach beyond the requirements found in the antitrust laws. *See* Verizon Br. at 15. Verizon contends that *Goldwasser* provides direction because it recognized the conflict between the general antitrust laws and the more specific legislation of the 1996 Act. *See id.*

Verizon argues that the Seventh Circuit properly upheld dismissal of the antitrust claims in that case because it correctly

recognized that the Telecommunications Act duties are not coterminous with the duties imposed upon monopolies under the antitrust laws. *See id.* at 16. Verizon contends that the antitrust laws do not oblige a service provider to make its services available to a competitor, at a wholesale price, so that the competitor can then resell those services to the general public. *See id.* at 17. Verizon points to practice in other regulated industries which does not require the sale of commodities to "non-competitive middlemen" under the antitrust laws. *See id.* (citing *HyPoint Tech., Inc. v. Hewlett–Packard Co.,* 949 F.2d 874, 877–78 (6th Cir.1991)).

Further, Verizon argues that antitrust litigation in the face of the regulatory scheme would be interruptive to the experts that have been put in place to resolve the disputes between ILECs and their competitors. *See id.* at 19. Verizon contends that Ntegrity's claims all relate to matters that are specifically required by the 1996 Act and the interconnection agreement between the parties. *See id.* at 20. Verizon maintains that each allegation is directed at the terms of the interconnection agreements, which Ntegrity helped to draft. *See id.* at 21. Verizon points out that Congress has entrusted oversight of the interconnection agreements created under the 1996 Act to state created commissions. *See id.*

Verizon also argues that it does not have a duty under the antitrust laws to sell its services to a re-seller who in turn sells those same services to the general public. *See id.* at 22. Verizon contends that this makes the duties imposed by the Telecommunications Act more onerous than those created by the antitrust laws. Thus, it argues that the antitrust laws must not be applied to enforce obligations that were only created by very specific regulatory legislation. *See id.*

Ntegrity responds first that a motion to dismiss the antitrust claims has already been decided by the Honorable Anne E. Thompson during previous motion practice, and that the decision is binding law of the case. *See* Ntegrity Br. at 13. Ntegrity points out that the doctrine is not designed to limit the federal court's power, but that courts in the Third Circuit have applied the doctrine to interlocutory decisions. *See id.* at 13–14. Ntegrity argues that the holding in *Goldwasser* was made a subject of Verizon's reply brief in the previous motion practice, and that it submitted a letter in response to those arguments. *See id.* at 15–16.

Addressing the substance of the motion, Ntegrity argues that *Goldwasser* is not persuasive and does not create binding authority that this Court must follow. *See id.* at 21. Ntegrity also seeks to distinguish the holding in *Goldwasser* because that antitrust case was brought by consumers rather than a competitor. *See id.* Ntegrity argues that *Goldwasser* should have been decided on more limited grounds, and is inapplicable to claims brought by competitors. *See id.* at 22. Ntegrity contends that the Seventh Circuit did not need to reach the issue of whether violations of the 1996 Act alone would be sufficient to state an antitrust claim. *See id.* at 23. It also argues that the Seventh Circuit went even further in holding that antitrust claims that are related, but not identical, to claims under the 1996 Act are not cognizable. *See id.* at 24. Ntegrity maintains that Judge Thompson must have "necessarily decided not to follow this *dicta* from an out-of-circuit consumer case." *Id.* (alteration in original).

Ntegrity argues that its Counterclaim alleges conduct that violates the general antitrust laws. *See id.* at 25. It also argues that Verizon interprets its claims as alleging only conduct which violates the

1996 Act in an effort to make the Counterclaim amenable to dismissal on the grounds set forth in *Goldwasser*. *See id.* However, Ntegrity asserts that its claims are not limited only to plaintiffs' violations of the affirmative duties created by the 1996 Act. *See id.* at 26.

Ntegrity argues that it also alleges pernicious anti-competitive conduct such as fraudulent billings, illegal cancellation notices, misrepresentations made to Ntegrity customers, and illegal charges. *See id.* It contends that the antitrust laws were established to address plaintiffs' behavior. *See id.* Ntegrity asserts that it is irrelevant if Verizon's actions also violate the 1996 Act, and that this fact should not preclude its pursuit of an antitrust claim. *See id.*

Further, Ntegrity argues that the Telecommunications Act contains an express savings clause which states "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." *Id.* at 33 (quoting 47 U.S.C. § 152). Ntegrity also points to recent submissions by the Federal Communications Commission and the Department of Justice, both of whom have concluded that private actions seeking damages were not repealed by the 1996 Act. *See id.* at 34. Ntegrity notes that the opinion of an agency, on a matter within its jurisdiction, is entitled to great deference. *See id.* Ntegrity argues that deferral by this Court to a state commission essentially creates an abstention, and deprives it of a federal forum. *See id.* at 35. Ntegrity contends that state Public Utility Commissions ("PUCs") have only a very limited role in the negotiating and approval of interconnection agreements. *See id.* It further maintains that this role does not create a pervasive regulatory scheme that should divest this Court of jurisdiction. *See id.*

The instant motion presents narrow issues which have not already been considered by this Court.[4] Plaintiffs request that this Court dismiss defendant's antitrust Counterclaim arguing that the 1996 Act requires affirmative duties from ILECs that reach above and beyond the duties imposed by the antitrust laws. Ntegrity argues that its claims are not based solely upon the duties imposed by the 1996 Act, and that the allegations are sufficient to state a Sherman Act claim because Verizon engaged in general anti-competitive conduct.

Verizon brought the instant motion based upon the precedent set by *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir.2000). While the instant motion was under the consideration of this Court, the Second Circuit decided *Trinko v. Bell Atlantic Corp.*, 294 F.3d 307 (2d Cir.2002), and the Eleventh Circuit decided *Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272 (11th Cir.2002). All three cases examine the interplay between the antitrust laws and the more specific legislation of the Telecommunications Act of 1996.

---

4. Ntegrity urges this Court to disregard the instant motion to dismiss the Counterclaim arguing that Judge Thompson has already considered the sufficiency of the Counterclaim and impliedly rejected the holdings of the Seventh Circuit in *Goldwasser* 222 F.3d 390. However, the holding in *Goldwasser* was not mentioned in the prior opinion, nor was the origin of the relationship between the these two parties. As such, this Court is obligated to consider issues of law which might preclude the antitrust causes of action. Further, Ntegrity's Counterclaim and Third Party Complaint were amended after the previous motion practice, thus inviting review of the revised pleading. Therefore, the Court will consider the instant motion because the rule of law created by *Goldwasser* was not fully briefed or considered in the prior motion to dismiss.

In *Goldwasser*, the Seventh Circuit encountered a lawsuit brought by consumers who had purchased their telephone service from an incumbent local exchange carrier, Ameritech. *See Goldwasser*, 222 F.3d at 392. As purchasers of telephone services, the plaintiffs therein filed a lawsuit alleging antitrust violations for Ameritech's failure to comply with the 1996 Telecommunications Act. *See id.* at 392, 395–96.

The *Goldwasser* plaintiffs claimed that Ameritech controlled more than 90% of the markets for local telephone service in their states. *See id.* at 394. They also alleged that Ameritech operated in such a manner so as to exclude competition and did not provide competitors with access to the facilities as contemplated by the Act. *See id.* The plaintiffs alleged that Ameritech did not provide its competitors with access to quality service, unbundled services and nondiscriminatory access to its operational support systems. *See id.* Further, the *Goldwasser* plaintiffs claimed that Ameritech failed to fully unbundle its network elements, and that competitors have experienced undue delays in switching and fees for originating and terminating phone service. *See id.* at 395. The plaintiffs in *Goldwasser* asserted that Ameritech continued to bill customers that had been transferred to competitors and this caused some former Ameritech customers to be double-billed. *See id.*

The District Court dismissed the complaint holding that the filed rate doctrine barred the claims for damages under the antitrust statutes. *See id.* The District Court went on to find that the plaintiffs lacked standing under the antitrust laws, and that the consumers were not able to sue for enforcement of the duties imposed upon ILECs by the Telecommunications Act. *See id.* at 396.

On appeal, the Seventh Circuit affirmed the dismissal of the plaintiffs' complaint, but based upon a different rationale. *See* *id.* at 399. The Seventh Circuit determined that the *Goldwasser* plaintiffs did in fact have standing to allege antitrust claims. *See id.* at 398. The Court found that as direct purchasers of Ameritech's products, they had sufficiently alleged an antitrust injury, specifically, the overcharges they experienced as a result of the monopoly. *See id.* However, the Court found that the plaintiffs could not pursue their claim because the duties in the 1996 Act are not coterminous with the duties imposed by the antitrust laws. *See id.* at 399. In other words, the Seventh Circuit found that the 1996 Act imposed burdens on monopolists that were more comprehensive than the general duties under the antitrust laws. *See id.*

The Court reasoned that Congress could have simply lifted any existing regulatory prohibitions on phone service competition and allowed the antitrust laws to provide a solution for the existing telephone monopoly. *See id.* at 399–400. Rather, the Court observed, that Congress created a complex regulatory scheme to foster competition and ultimately enhance customer pricing for local phone service. *See id.* The Seventh Circuit determined that the plaintiffs' complaint alleged violations of duties which went beyond any requirements created by the antitrust laws. *See id.* at 400. The Court stated "[w]e think it both illogical and undesirable to equate a failure to comply with the 1996 Act with a failure to comply with the antitrust laws." *Id.*

The Court went on to clarify that it did not find that the 1996 Act conferred an implied immunity from the antitrust laws. *See id.* at 401. The Seventh Circuit noted that the savings clause set forth in the legislation would seriously complicate such a determination, and held only that the more specific regulations in the 1996 Act should control. *See id.* Finally, the Court addressed whether any allegations in the

plaintiffs' complaint could be divorced from the claims under the 1996 Act. *See id.* The Seventh Circuit reviewed plaintiffs' complaint and the contention that Ameritech's control of essential facilities stated a violation of the general antitrust laws. *See id.* The Court determined that those allegations, when read with the complaint as a whole, were inextricably linked to the duties required of the ILEC under the Act, and therefore could not create liability under the general antitrust rules. *See id.*

Also recently decided, is *Trinko,* 294 F.3d at 329–30, in which the Second Circuit determined that the consumer plaintiffs therein were entitled to maintain an antitrust action against an incumbent local exchange carrier. The plaintiffs in *Trinko* were purchasers of local telephone service from a competing carrier. *See Trinko,* 294 F.3d at 310–11. Those plaintiffs claimed they were damaged when Bell Atlantic denied their local service carrier, AT & T, equal access to the local network. *See id.* They alleged violations of section 202(a) of the Communications Act of 1934; violations of subsections (b) and (c) of section 251 of the Telecommunications Act of 1996; violations of section 2 of the Sherman Antitrust Act; and tortious interference with contract. *See id.*

After reviewing the legislative history of the 1996 Act, the Second Circuit reviewed the procedural history of the case under its review. *See id.* at 312. The Court observed that AT & T had negotiated and arbitrated an interconnection agreement with Nynex, the ILEC in the New York area. *See id.* at 313. Shortly after the creation of that agreement, AT & T filed complaints with the regulatory authorities alleging lost and delayed orders. *See id.* Nynex and AT & T entered into a consent decree and resolved their dispute in its entirety. *See id.*

Bell Atlantic moved to dismiss the plaintiffs' claims, and the District Court granted the motion with respect to the antitrust and 1934 Act claims and declined to retain jurisdiction over the remaining state law claims. *See id.* at 314. The District Court, relying on *Goldwasser,* found that the duties imposed by the Telecommunications Act alone did not create antitrust liability. *See id.* at 314. The District Court characterized the claims as solely alleging violations of the duties imposed by the 1996 Act, and thus insufficient to state an antitrust claim. *See id.*

Further, the District Court considered the claims under the Telecommunications Act and concluded that private lawsuits are generally incompatible with the regulatory scheme established by the Act. *See id.* The Court ultimately found that the consumer plaintiffs lacked prudential standing to pursue claims under the 1996 Act because § 251 created duties on behalf of an ILEC that must be rendered to a competing local exchange carrier, and not to a CLEC's customers. *See id.* Similarly, the District Court determined that only the customers of an incumbent carrier could state a claim under section 202(a) of the Communications Act because that section creates duties for the carrier with respect to its own customers. *See id.* The plaintiffs' complaint was dismissed in its entirety, with leave to re-plead. *See id.* at 315. Upon submission of the new complaint, the defendants once again moved to dismiss, and the District Court also granted that motion. *See id.*

The Second Circuit first considered whether the *Trinko* plaintiffs had standing to bring a claim under section 202(a) of the Communications Act and section 251(b) and (c) of the Telecommunications Act. *See id.* The Second Circuit found that the District Court had incorrectly dismissed the claims on the grounds of prudential standing and re-instated the section 202(a) claims. *See id.* at 318–19. However, the

Court agreed with the dismissal of the section 251(b) and (c) claims, but for reasons other than those offered by the District Court. *See id.* at 319–20.

The Court examined the claims under section 251 and determined that they only alleged violations of the duties imposed on ILECs regarding the creation of interconnection agreements mandated by the Telecommunications Act. *See id.* Additionally, the Court found that AT & T and Bell Atlantic had already utilized the contracting process created by the 1996 Act, and arrived at a fully approved interconnection agreement. *See id.* at 321. Therefore, the Second Circuit found that the consumer plaintiffs would be unable to state a claim under section 251 of the Act. *See id.* at 322.

As for the plaintiffs' antitrust claims, the Circuit Court disagreed with the dismissal of those allegations. *See id.* at 324. The Court agreed, however, that the plaintiffs did have standing to allege antitrust violations. *See id.* at 325. The Second Circuit observed "it is clear that a plaintiff would not state an antitrust claim against a defendant simply by alleging that the defendant violated its duties under section 251." *Id.* at 326. However, parting company with the Seventh Circuit, the Court determined that the complaint did not solely describe activities which would violate section 251, but also made allegations "that may support an antitrust claim under a number of theories." *Id.*

Specifically, the amended complaint stated a claim under the essential facilities doctrine, which requires a monopolist to give access to necessary equipment so that competitors are able to compete in the market. *See id.* The plaintiffs also adequately alleged a monopoly leveraging claim. *See id.* Finally, they sufficiently alleged an attempted monopolization claim, which the Court found was derivative of the essential facilities and leveraging claims. *See id.* at 327.

The Second Circuit also discussed the result in the *Goldwasser* case. *See id.* The Court observed that an antitrust action cannot be precluded simply because the facts alleged might also state a claim under the 1996 Act. *See id.* An opposite determination would create an implied immunity that would override the legislative intent behind the specific savings clause in the Act. *See id.* However, the Court was careful to clarify that the *Trinko* plaintiffs would be unable to pursue a claim under section 251 of the 1996 Act because they were not parties to the interconnection agreements, and needed protection under the antitrust laws. *See id.* at 328.

The Court also found that there is no inherent conflict with the regulatory scheme of the 1996 Act if a plaintiff only sought monetary damages. *See id.* at 329. The Court did not find a conflict with making ILECs subject to the antitrust laws as well as their interconnection agreements. *See id.* Finally, the Court observed "[c]ourts may not be suited to order particular actions by telecommunications carriers to make the local markets more competitive, particularly when there is a specific regulatory scheme meant to serve the same purpose." *Id.*

The most recent case to review antitrust claims raised in the context of the 1996 Act, is *Covad Communications*, 299 F.3d 1272. The plaintiff in *Covad*, a competing local exchange carrier, alleged that the defendant had violated their interconnection agreement and had engaged in broad exclusionary behavior. *See Covad*, 299 F.3d at 1276–77. Covad alleged that Bellsouth had denied them access to essential facilities, namely its network of phone lines. *See id.* at 1283–84. Further, Covad claimed that Bellsouth had refused to deal with it regarding those essential facilities. *See id.* Covad claimed the defendant had refused to deal with it because of an intent

to maintain its local telephone service monopoly. *See id.* Finally, Covad alleged that Bellsouth had manipulated its role as a ILEC to create a price squeeze to eliminate Covad's competition by lowering its own retail prices to a level that was detrimental to itself. *See id.*

The District Court, relying on *Goldwasser,* dismissed the plaintiff's complaint. *See id.* at 1278–79. The Court found that in the absence of an affirmative duty to assist competitors, the plaintiffs had not stated a claim for an antitrust violation. *See id.* Further, the Court held that the remaining allegations could not be divorced from the duties imposed under the 1996 Act. *See id.* The District Court also dismissed Covad's 1996 Act claims under sections 206 and 207, finding that the regulatory scheme prohibited the filing of such claims in federal court. *See id.*

Reversing, the Eleventh Circuit found that the plaintiff had in fact stated claims arising under the general antitrust laws. *See id.* at 1286–87, 1289–91. Initially, the Court found that the plain language of the 1996 Act states that nothing in the legislation should be construed as a preemption of the antitrust laws. *See id.* at 1280–81. The Court examined each of plaintiff's claims for denial of access to essential facilities, refusal to deal, and price squeezing. *See id.* at 1286–91. Each of Covad's theories stated a claim under the general antitrust laws absent the existence of the 1996 Act and the duties created thereunder. *See id.* The Court also reinstated the Telecommunications Act and common law claims based on recent authority which determined that state commissions were not authorized to interpret interconnection agreements. *See id.* at 1291–92.

Essentially, the Seventh, Second and Eleventh Circuits are in agreement on one principle; that violations of the 1996 Act, standing alone, do not create liability under the general antitrust laws. All three Courts of Appeal considered whether any of the allegations could be separated from the duties arising under that Act. Neither *Goldwasser* nor *Trinko* is directly on point with the issue before this Court. Both of those cases involved the application of antitrust litigation in the context of interconnection agreements as those agreements affected consumers, not the contracting parties. The holding in *Trinko* was expressly conditioned on the fact that the lawsuit at issue was brought by consumers, who had no recourse under the interconnection agreement between the ILEC and the CLEC. *See Trinko,* 294 F.3d at 328. The Court in *Covad* directly addressed the issue of whether a CLEC may state an antitrust claim against the ILEC with which it has formed an interconnection agreement. However, as will be discussed, the facts alleged in Covad's complaint are distinguishable from the allegations *sub judice.*

■ This Court agrees with the conclusion reached in all three cases; that allegations of a breach of an interconnection agreement, standing alone, do not state an antitrust claim. Parties to an interconnection agreement with claims that the ILEC has failed to honor that contract may not resort to antitrust litigation to resolve those claims. Essentially what is before this Court is Ntegrity's disappointment with the interconnection agreements that it negotiated with Verizon. The parties negotiated the terms of their own agreements, and those contracts were approved by the Public Utility Commissions in the respective states. *See* Am. Answer ¶ 17; Verizon Br. at 4.

Ntegrity's antitrust claims stem only from Verizon's performance under the express terms of the interconnection agreements. *See* Am. Answer ¶¶ 21–67. Those obligations alone cannot form the basis of an antitrust action. *See Covad,* 299 F.3d

at 1283–84; *Trinko,* 294 F.3d at 326; *Goldwasser,* 222 F.3d at 401; *Cavalier Telephone, LLC. v. Verizon Virginia, Inc.,* 208 F.Supp.2d 608, 616–17 (E.D.Va.2002); *MGC Communications, Inc. v. BellSouth Telecommunications, Inc.,* 146 F.Supp.2d 1344, 1352 (S.D.Fla.2001). Ntegrity has not made any allegations that Verizon denied it access to essential facilities, or that Verizon refused to deal with it on that basis. Further, although Ntegrity complains about the charges it received from Verizon, there is not an allegation that Verizon lowered its own retail rates in an effort to make service with Ntegrity appear unattractive to consumers. Such allegations would state a claim under the general antitrust laws even absent the existence of the 1996 Act. *See Covad,* 299 F.3d at 1286–91; *Trinko,* 294 F.3d at 326.

It is abundantly clear that implied immunity is not created simply because a plaintiff's claims might also arise under the Telecommunications Act. *See Essential Communications Systems, Inc. v. AT & T Co.,* 610 F.2d 1114, 1120 (3d Cir.1979); *Covad,* 299 F.3d at 1281–84; *Trinko,* 294 F.3d at 326. Therefore, the remaining question before the Court is whether any of Ntegrity's allegations state a valid claim for anti-competitive conduct under the antitrust laws. In order to establish a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, a plaintiff must demonstrate: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); *see also Pastore v. Bell Telephone Co.,* 24 F.3d 508, 512 (3d Cir.1994).

It must also be noted that even a monopolist does not have a general duty to cooperate with a competitor. *See Aspen Skiing, Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). However, a company's right to select its business associates is not unqualified. *See id.* at 602, 105 S.Ct. 2847. The alleged monopolist may not refuse to deal with a competitor if it has the specific intent to either maintain or create a monopoly. *See id.* Evidence of this specific intent is abundant when a business refuses to engage in a deal that would profit both the business and the competitor. *See id.* at 601–603, 105 S.Ct. 2847.

Ntegrity also alleges a violation of section 2(a) of the Clayton Act, commonly referred to as the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a). Such a claim can be established by a showing of different prices charged to different customers. *See Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.,* 63 F.3d 1267, 1271 (3d Cir.1995). Price discrimination in and of itself is not illegal. *See id.* Rather a plaintiff must show a reasonable probability of competitive injury. *See id.* Monopoly power, simply put, is "the power to control prices and exclude competition." *See Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 311 (3d Cir.1982) (citation omitted).

A close reading of Ntegrity's allegations demonstrates that its claims stem only from Verizon's performance under the interconnection agreements based on the 1996 Act. The Counterclaim specifies Ntegrity's dissatisfaction with Verizon's performance, but does not allege behavior that would otherwise constitute an antitrust violation.

Ntegrity complains that Verizon refused to provide it with electronic bills so it could more efficiently audit its bills. *See Am.*

Answer ¶¶ 21–25. However, as alleged in the Counterclaim, the interconnection agreement negotiated by the parties clearly stated that Ntegrity would only receive paper bills from Verizon. *See id.* ¶ 72; Contracts ¶¶ 5.1, 5.5.[5] The same is true of Ntegrity's complaints regarding the allegedly discriminatory computer database that the Contracts require Ntegrity to utilize. Paragraph Seven specifically requires that Ntegrity utilize Verizon's processes and procedures for setting up new service and making service changes for its customers. *See* Contracts ¶ 7. The Counterclaim alleges that Verizon discriminated against it as a competitor in the filing and pricing of its tariffs. *See* Am. Answer ¶¶ 28–32. However, the Counterclaim also states that these allegedly fraudulent tariffs were imposed on Verizon's regular customers, not solely on competing CLECs. *See id.* Ntegrity merely extrapolates what it believes it would have been overcharged if Verizon had only billed them the lowest fee contemplated by the Contracts. The same is true of Ntegrity's price discrimination claim. Ntegrity clearly states that all of Verizon's customers were subject to the same fees and alleged accounting errors that Ntegrity experienced. *See id.* ¶¶ 31–40. This allegation establishes that Verizon has not charged Ntegrity higher prices and fees than it has charged to its retail customers.

Additionally, the range, availability and quality of service provided by Verizon are all issues covered under the Contracts. *See id.* ¶ 9.1. The interconnection agree-ments require Ntegrity to provide dedicated customer service to its customers and explicitly state that Verizon would not field any service or inquiry calls from Ntegrity's customers. *See id.* ¶ 34.2. This express provision proscribes Ntegrity's complaints about Verizon's handling of Ntegrity customer inquiries. The same is true of Ntegrity's claims about the dial-around numbers it contends Verizon re-routed. The Contracts explicitly reserve the right for Verizon to "change the telephone numbers used by an end user." *Id.* ¶ 38.3. This provision precludes Ntegrity's allegations based on Verizon's provision of service for particular numbers.

Although Ntegrity claims that the cancellation notices and billings it received were "illegal," the Counterclaim clearly establishes that those circumstances were created by the parties in the course of their negotiations under the Act. Ntegrity's complaint merely alleges that Verizon complied with the terms of the interconnection agreements that Ntegrity now finds objectionable. The Counterclaim confirms this reading because Ntegrity seeks cancellation of the contracts in order to discontinue "Third Party Defendants' anti-competitive conduct and violations of the Telecommunications Act under the ... contracts." Am. Answer ¶ 70. Sanctioning the use of antitrust lawsuits to resolve disputes under an interconnection agreement would invite CLECs to negotiate poor agreements and then allege antitrust violations in order to seek treble damages based on the ILECs' failings under, or, as

5. Each of the three interconnection agreements between the parties have been included in the pleadings of each plaintiff. The contract between Verizon Pennsylvania and Ntegrity was attached to plaintiff's initial Complaint, as was the contract between Verizon New Jersey and Ntegrity. Verizon Maryland included a copy of its interconnection agreement along with its Third Party Counterclaim. As these documents are relied upon and referred to by each of the Complaints and the Counterclaim, this Court may refer on the contents of these contracts in ruling on the instant motion to dismiss. *See In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3d Cir.1997). Each of the agreements are substantively similar, and the Court will refer to the collective agreements as the "Contracts" unless a specific provision varies in the context of an individual contract.

in this case, compliance with those agreements. The antitrust laws were designed to promote free competition and enhance consumer access to services, not to be an end-run around legislation imposing very specific duties. Therefore, Ntegrity's antitrust claims will be dismissed.

■ Similarly, Ntegrity's state law antitrust claims will also be dismissed. The New Jersey antitrust statutes are to be construed consistently with federal antitrust regulations. *See Nanavati v. Burdette Tomlin Mem. Hosp.*, 857 F.2d 96, 111 (3d Cir.1988). The Pennsylvania and Maryland antitrust laws are also construed in line with the federal antitrust provisions. *See Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994); *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 379 (4th Cir.1992). Ntegrity does not offer any claims in support of its state law antitrust claims that are not proffered in support of its allegations under the federal antitrust laws. Therefore, Ntegrity's state law antitrust claims are also dismissed.

### 2. Ntegrity's Telecommunications Act Claim

Verizon also requests that this Court dismiss Ntegrity's allegations under 47 U.S.C. § 251(b) and (c)(4). Verizon urges dismissal of Ntegrity's second attempt to plead a claim under the Telecommunications Act. *See* Verizon Br. at 23. The Verizon companies contend that the only authority this Court may exercise in relation to a dispute under the interconnection agreements arises when and if "a State commission makes a determination." *Id.* (quoting 47 U.S.C. § 252(e)(6)). Verizon maintains that Ntegrity's Counterclaim under the Act must be dismissed because they have not first attempted resolution through the state commissions. *See id.* at 24.

Ntegrity argues that it has stated a proper claim under the 1996 Act. *See id.* at 37. Defendant maintains that sections 206 and 207 of the 1934 Telecommunications Act vest federal courts with jurisdiction to hear claims of violations of that act. *See* Ntegrity Br. at 35. Ntegrity asserts that Judge Thompson did not rule to the contrary in dismissing its original claim under the Telecommunications Act. *See id.* at 38. Rather, Ntegrity highlights that Judge Thompson granted it leave to re-plead its claims. *See id.* Ntegrity presumes that Judge Thompson granted defendant leave to re-plead because the Court did not find the claims to be futile. *See id.* at 39. Defendant argues that the amendments to the Act in 1996 do not operate independently of the original 1934 Act, and sections 206 and 207 still provide a basis for a private cause of action under the Telecommunications Act. *See id.* at 40.

Ntegrity argues that it does not allege that the interconnection agreements at issue fail to meet the requirements of sections 251 and 252 of the Act. *See id.* at 42. Rather, Ntegrity states that Verizon failed to fulfill the duties imposed by section 251 of the Act. *See* Am. Answer ¶¶ 69–79. Ntegrity alleges that Verizon provided its own customers with better service than it provided for Ntegrity's customers. *See id.* ¶ 129. Ntegrity complains that Verizon failed to provide it with the pricing information, and intentionally caused a loss of phone service to Ntegrity customers. *See id.*

Section 251 of the 1996 Act requires ILECs "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). It also imposes the duty of resale on ILECs. *See id.* § 251(c)(4). In providing its services, the ILEC must "offer for resale at wholesale rates any telecommunications service that

the carrier provides at retail to subscribers who are not telecommunications carriers." *Id.* § 251(c)(4)(a). The incumbent must do so without the imposition of unreasonable or discriminatory conditions. *See id.* § 251(c)(4)(B).

An ILEC may choose to fulfill the obligations set forth in section 251 by entering into a negotiated agreement as specified in section 252. *See Trinko*, 294 F.3d at 321. If the parties negotiate an interconnection agreement, they may enter a binding agreement "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1). The Act expressly allows for agreements to be negotiated which do not necessarily define the same duties contemplated by section 251. *See Trinko*, 294 F.3d at 322. As set forth previously, Verizon negotiated with Ntegrity and agreed upon the terms of the interconnection agreements.

■ The Verizon companies complied with the requirements of section 251(b) and (c) by entering into a negotiated interconnection agreement with Ntegrity. *See* 47 U.S.C. § 252(a)(1). Upon the approval of the agreements, the duties of each party are defined by the parameters of their agreement rather than section 251(b) and (c). *See Trinko*, 294 F.3d at 323. Ntegrity may not rely upon the general duties imposed by section 251 to litigate around the specific language provided in the negotiated contracts. *See id.* Rather than negotiating agreements that Ntegrity now alleges are discriminatory, Ntegrity could have availed itself of the arbitration process to implement the duties enumerated under section 251(b) and (c). *See* 47 U.S.C.

§ 252(b)(1) and (c)(1). Ntegrity has not stated a claim under section 251 of the 1996 Act.[6] Therefore, plaintiffs' motion to dismiss the Counterclaim is granted as to Ntegrity's Telecommunications Act claim.

### *3. Ntegrity's State Law Claims*

Finally, Verizon argues that if this Court dismisses Ntegrity's federal claims, it should also dismiss the remaining state law claims for a lack of jurisdiction because Verizon Maryland and Ntegrity are both citizens of Maryland. *See* Verizon Br. at 24. Verizon maintains that a dismissal of the federal question claims, and a lack of diversity, necessitates dismissal of Ntegrity's Counterclaim. *See id.* Verizon further argue that the remaining state law claims rely upon allegations similar to those asserted in support of Ntegrity's antitrust claims. *See id.* Ntegrity argues against dismissal of the state law claims. *See* Ntegrity Br. at 43. Ntegrity maintains that Verizon fails to set forth any new arguments that were not presented to this Court in the prior determination of the legal sufficiency of those claims. *See id.* at 43.

■ Initially, it must be noted that dismissal of the state law Counterclaims is not appropriate based on plaintiffs' suggestion of a lack of jurisdiction. As Counterclaims, Ntegrity's allegations are properly before this Court, and cannot be dismissed for the lack of an independent jurisdictional basis. *See* 28 U.S.C. § 1367(a). Additionally, Verizon does not provide any support for the dismissal of Ntegrity's state

---

6. Ntegrity argues that its claim is cognizable under sections 206 and 207 of the 1934 Act because those provisions provide for federal court jurisdiction over violations of the Act. However, as stated, Ntegrity has not properly pled violations of the section 251. Therefore, there is no violation of the Act which would be cognizable under §§ 206 and 207. This

conclusion also moots the question of whether this Court may address disputes arising under interconnection agreements, or if it may only act once a state commission has made a final determination as Verizon urges. As Ntegrity has failed to state a claim, the Court does not need to reach this issue.

law claims beyond the reasons asserted for dismissal of the antitrust allegations.

 Ntegrity alleges that Verizon violated the interconnection agreements by providing false and inaccurate billing. Ntegrity also alleges that Verizon failed to provide telephone service to its customers in accordance with its contracts. Finally, Ntegrity claims that Verizon contacted its customers and attempted to intercept their decision to switch to an alternate service provider. These factual allegations are sufficient to state claims for breach of contract, and tortious interference. The interconnection agreements give rise to these independent contractual obligations by virtue of their existence. The state law claims cannot be dismissed simply because they rely on the same factual allegations as the antitrust claims.[7] Therefore, Verizon's motion to dismiss is denied as to Ntegrity's remaining state law claims.

## C. Ntegrity's Motion to Dismiss Verizon's Complaints

Ntegrity also moves to dismiss Verizon's collection actions for lack of standing pursuant to Fed.R.Civ.P. 17(a). *See* Ntegrity Br. at 44. Ntegrity states that the original Complaints detail that Verizon Pennsylvania and Verizon New Jersey assigned their rights to enforce the contracts to Bell Atlantic Network Services ("Network Services"). *See id.* Ntegrity maintains that Network Services is the only proper plaintiff capable of prosecuting the instant collection actions. *See id.* Ntegrity argues that the Amended Complaint does not make any reference to Network Services

as a plaintiff, and that this omission is fatal to the collection actions. *See id.*

Finally, Ntegrity seeks dismissal of the quasi-contractual claims. *See id.* at 48. Ntegrity argues that the existence of the contracts between the parties prevents Verizon from proceeding on an alternate theory of unjust enrichment. *See id.* Ntegrity maintains that because Verizon has not alleged recision of the contract, it cannot proceed on a quasi-contractual theory. *See id.*

Verizon responds that all of the plaintiffs are subsidiaries of Verizon Communications, Inc., and any potential standing problem can be easily resolved. *See* Verizon Reply Brief ("Verizon Reply") at 28. In response to Ntegrity's request for dismissal of the quasi-contractual claims, Verizon states that it has pled the *quantum meruit* claim in the alternative, as is contemplated by Federal Rule of Civil Procedure 8(a). *See id.* at 29. Verizon highlights that Ntegrity has justified its failure to pay the amounts due under the agreements by referring to an alleged prior breach by Verizon. *See id.* Verizon maintains that they are not seeking to alter the terms of the interconnection agreements through a quasi-contractual claim, but rather to ensure its ability to seek restitution if the contracts are deemed void. *See id.*

Federal Rule of Civil Procedure 17(a) states "[e]very action shall be prosecuted in the name of a real party in interest." The rule also states "[n]o action shall be dismissed on the ground that it is not

---

7. Verizon does not argue that Ntegrity's state law claims are precluded under the Telecommunications Act. However, the Contracts between the parties specifically provide for dispute resolution by any means "that may be available under this Agreement or at law or in equity." *See* Contracts ¶ 22. Although the issue has not been briefed by the parties, it does not appear that section 252(e)(6) pre-

cludes Ntegrity's state law claims. *See* 47 U.S.C. § 152 (expressly preserving antitrust and additional causes of action in light of the Act). Further, the Court notes that if Ntegrity's state law claims for breach of contract are precluded by the Telecommunications Act, Verizon's breach of contract actions would also be precluded.

prosecuted in the name of a real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." Fed.R.Civ.P. 17(a).

■■■ The purpose of requiring the real party in interest to prosecute a lawsuit is to avoid prejudice and the possibility of duplicate lawsuits. *See Metal Processing, Inc. v. Humm,* 56 F.Supp.2d 455, 461 (D.N.J.1999). The Rule also exists to allow a defendant to set out all of its defenses in one action. *See id.* There is obviously a preference for a determination of a dispute on its merits rather than on a technicality. The facts in this case do not support dismissal under Fed.R.Civ.P. 17(a). There is certainly no risk that Ntegrity might be subject to multiple actions because Verizon owns all of the claims against defendant in one form or another. Further, since the filing of Ntegrity's cross-motion to dismiss for failure to name a proper party, Verizon has filed a ratification by Network Services Inc., which was the assignee of its interest in prosecuting the collection actions. *See* Transcript of Oral Argument ("Tr.") at 30:17–31:1–11. Network Services has also re-assigned the collection claims to Verizon Pennsylvania and Verizon New Jersey. *See id.* at 31:2–5. This ratification and re-assignment corrects any potential issue presented by the Amended Complaint. Therefore, Ntegrity's Rule 17(a) motion is denied.

■■ Finally, as to Ntegrity's motion to dismiss the *quantum meruit* claim, it is clear that Verizon may plead alternative causes of action. *See* Fed.R.Civ.P. 8(e)(2). Verizon may state two alternative claims in order to preserve its rights, especially in light of Ntegrity's request for contract cancellation *See* Am. Answer ¶ 70. As such, Ntegrity's motion to dismiss Veri-

zon's *quantum meruit* claim is denied without prejudice.

### III. CONCLUSION

Therefore, for the reasons expressed herein, plaintiffs' motion to dismiss is granted in part and denied in part and defendant's cross-motion to dismiss is denied. An appropriate form of Order shall be filed herewith.